## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:96-CR-00203 |
| v. | (Chief Judge Brann) |
| RAYFUL EDMOND, III, | |
| Defendant. | |

## MEMORANDUM OPINION

**APRIL 18, 2023**

In 1997, Rayful Edmond, III was sentenced to a term of 30 years' imprisonment following his plea of guilty for conspiring—while incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg")—to distribute significant quantities of cocaine in the District of Columbia area. Due to this significant sentence, along with the fact that Edmond was already serving a life sentence for drug trafficking, Edmond remains incarcerated nearly thirty years later, despite two subsequent reductions to his term of imprisonment.

Edmond now seeks compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). Despite the rehabilitative efforts that Edmond has undertaken during his incarceration and the family support that he enjoys, he has failed to demonstrate the existence of any extraordinary and compelling reason that would warrant the grant of compassionate release. Accordingly, this motion must be denied.

## I.      BACKGROUND

In 1996, Edmond pled guilty, pursuant to a written plea agreement, to conspiracy to possess with the intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count criminal forfeiture, in violation of 21 U.S.C. § 853.[1] Edmond's conviction related to his conduct while incarcerated at USP Lewisburg when, from approximately January 1991 until July 1994, he organized and managed a conspiracy to distribute cocaine.[2] For a commission, Edmond connected cocaine producers and their agents in Colombia with drug traffickers in the District of Columbia area, who would then resell that cocaine to others in the region.[3] Notably, Edmond was incarcerated at USP Lewisburg after having been convicted of operating "what prosecutors called the largest cocaine distribution operation in the history of the nation's capital."[4]

Prior to sentencing, a presentence report (PSR) was prepared that calculated a base offense level of 38, as the offense involved 150 kilograms or more of cocaine; the offense level was increased by two points because the offense involved firearms and by four levels because Edmond was an organizer or leader of criminal activity.[5]

---

[1]   Doc. 41-1 at 4; *see* Docs. 2, 16.

[2]   Doc. 41-1 at 6.

[3]   *Id.*; *see id.* at 6-9.

[4]   *United States v. Edmond*, 52 F.3d 1080, 1091 (D.C. Cir. 1995).

[5]   PSR at 10-11. Stunningly, the copy of the PSR provided by Edmond's attorney is missing two nonconsecutive pages; pages 9 and 11. *See* Doc. 41-1. And, perhaps not coincidentally, these two pages address the firearm enhancement and the factual allegations that supported that enhancement, an issue that Edmond placed in contention in that motion. *See* Doc. 41 at 2-3. Because those pages are missing and are critical to the outcome of this motion, the Court

The PSR applied a three-level reduction for acceptance of responsibility, resulting in a total offense level of 41; that, along with a criminal history category III, resulted in a sentencing guidelines range of 360 months to life imprisonment.[6]

Edmond had no objections to the PSR and, accordingly, the Honorable Malcolm Muir[7] calculated a sentencing guidelines range of 360 months to life imprisonment.[8] After hearing from the parties, Judge Muir sentenced Edmond to 360 months' imprisonment.[9] That sentence was to run consecutive to the life sentence imposed by the United States District Court for the District of Columbia that Edmond was then serving.[10]

In 2021, Edmond filed a motion for a sentence reduction pursuant to *United States Sentencing Guidelines Manual* Amendment 782.[11] This Court granted that motion and reduced Edmond's sentence to 324 months' imprisonment, which was the lowest sentence that the Court could impose.[12] A subsequent motion for a sentence reduction was filed, and Edmond's sentence was again reduced, this time to 288 months' imprisonment.[13]

---

obtained a complete copy of the PSR from its Probation Office. A copy of the PSR will be docketed in a separate, sealed entry to this Docket for future reference.

[6]   PSR at 11-14.
[7]   Judge Muir has since died, and the Undersigned was assigned to this matter in June of 2021.
[8]   Doc. 41-2 at 32-33.
[9]   *Id.* at 41; *see* Doc. 34.
[10]  Doc. 34.
[11]  Doc. 41.
[12]  Doc. 56 at 7-8; *see* Doc. 57.
[13]  Docs. 78, 79, 80.

Edmond has now filed a motion for compassionate release, in accordance with 18 U.S.C. § 3582(c)(1)(A).[14] Edmond offers several reasons why compassionate release is appropriate.

First, he notes that he has been denied early release opportunities and re-entry programs due to the prison program in which he participates, despite the fact that the First Step Act does not differentiate between inmates who participate in such programs and general population inmates.[15] Notably, because of Edmond's participation in that program, he is unable to simultaneously participate in the Residential Drug and Alcohol Program ("RDAP"), which permits, upon successful completion of the program, a reduction of an inmate's sentence by up to one year, along with six months of placement in a halfway house at the conclusion of the inmate's sentence.[16] He is also allegedly denied access to other rehabilitative programs that would ease his transition from prison.[17]

Second, Edmond contends that intervening changes in the law justify compassionate release.[18] Edmond received offense level increases for possession of a firearm during the offense and for playing a leadership role in the conspiracy which, Edmond contends, would no longer apply based on a combination of the

---

[14]   Doc. 108.
[15]   Doc. 109 at 11-14.
[16]   *Id.* at 11-12.
[17]   *Id.*
[18]   *Id.* at 14-20.

Supreme Court of the United States' decisions in *Apprendi v. New Jersey*[19] and *Alleyne v. United States*,[20] both of which were decided after Edmond was sentenced.[21]

Third, Edmond argues that the evidence demonstrates he is not a danger to the community, and the relevant 18 U.S.C. § 3553(a) factors militate in favor of compassionate release.[22] Specifically, Edmond asserts that his relatively advanced age,[23] his "impressive rehabilitation" efforts and work for the community,[24] his strong support system,[25] his excessive original sentence,[26] his failure to receive Good Time Credits,[27] his mother's rapidly declining health,[28] and other miscellaneous factors[29] all warrant compassionate release.

The Government responds that compassionate release is not appropriate.[30] First, to the extent that Edmond seeks release based on his mother's health, the Government notes that there is no evidence that Edmond is her sole caregiver, such that her health could constitute an exceptional and compelling circumstance.[31] And,

---

[19] 530 U.S. 466 (2000).
[20] 570 U.S. 99 (2013).
[21] Doc. 109 at 15-17.
[22] *Id.* at 21-44.
[23] *Id.* at 21-22.
[24] *Id.* at 22-26.
[25] *Id.* at 26-35.
[26] *Id.* at 36.
[27] *Id.* at 36-38.
[28] *Id.* at 40-41.
[29] *Id.* at 38-42.
[30] Doc. 118.
[31] *Id.* at 11-12.

although Edmond argues that compassionate release is warranted because he is unable to participate in RDAP or other similar programs, the Government asserts that such programs were not implemented with the purpose of reducing sentences, and participation in the programs is at the discretion of the United States Bureau of Prisons ("BOP"), meaning the denial of access to such programs cannot support Edmond's motion.[32]

As to Edmond's argument that the BOP is not properly calculating his Good Time Credit under the First Step Act, the Government contends that such an argument is properly brought pursuant to 28 U.S.C. § 2241, not a motion for compassionate release.[33] The Government further argues that nonretroactive changes in the law alone are insufficient to warrant compassionate release—and the United States Sentencing Commission exceeded its authority in promulgating amendments to the Sentencing Guidelines that provide otherwise—and, even if nonretroactive changes were sufficient, no changes in the law have altered Edmond's sentencing exposure.[34]

Fifth, the Government responds that Edmond's sentence was at the bottom of the Sentencing Guidelines range and was not unusually long, given that Edmond did not actually begin serving his sentence in this case until well after his sentencing—

---

[32] *Id.* at 12-13.
[33] *Id.* at 14-15.
[34] *Id.* at 15-17, 19-21.

after he completed his prior sentence imposed by the United States District Court for the District of Columbia.[35] Finally, the Government notes that rehabilitation, on its own, is explicitly excluded as sufficient ground for compassionate release.[36]

Edmond has filed a reply brief, rendering this matter ripe for consideration.[37] For the following reasons, Edmond's motion will be denied.

## II.  DISCUSSION

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization."[38] Congress has provided courts with the authority to modify sentences through its enactment of 18 U.S.C. § 3582(c)(1)(A). That statute permits courts to reduce an inmate's sentence if the inmate has exhausted his administrative remedies[39] and if, as relevant here, "extraordinary and compelling reasons warrant such a reduction."[40] Courts should also consider the relevant § 3553(a) sentencing factors,[41] whether compassionate release is consistent with the Sentencing Guidelines,[42] and whether "the defendant

---

[35]  *Id.* at 18-19.
[36]  *Id.* at 22.
[37]  Doc. 127.
[38]  *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007).
[39]  The Government concedes that Edmond has exhausted his administrative remedies, at least as to some arguments presented. Doc. 118 at 11 n.2.
[40]  18 U.S.C. § 3582(c)(1)(A)(i).
[41]  *Id.*
[42]  *Id.*

is . . . a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[43]

Congress has not defined the term "extraordinary and compelling" except to provide that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[44] Beyond that, the task of producing a coherent definition was largely left to the Sentencing Commission, which previously defined the term through commentary to its policy statement contained at USSG § 1B1.13 and, since November 2023, has defined that phrase in the policy statement itself contained at USSG § 1B1.13(b).[45]  As pre-2023 Sentencing Guidelines, it is well-established that courts are "not bound by the Commission's [pre-2023] policy statements,"[46] although the statement commentary "provides useful guidance for district courts in assessing a defendant's eligibility for compassionate release."[47]

The Court must first consider whether Edmond has presented extraordinary and compelling circumstances that would warrant compassionate release. As explained below, he has not. Because he has not, his motion must be denied without consideration of whether a sentence reduction is warranted.

---

[43]  *United States Sentencing Guidelines Manual* § 1B1.13(a)(2) (2021), (2023).

[44]  28 U.S.C.A. § 994(t).

[45]  The 2023 Sentencing Guidelines became effective on November 1, 2023—after Edmond filed his motion for compassionate release. Because the 2023 amendments to USSG § 1B1.13 do "not apply retroactively," they do not technically apply to Edmond's motion. *United States v. Kramer*, No. 23-1246, 2024 WL 313389, at *1 n.3 (3d Cir. Jan. 26, 2024).

[46]  *Id.* at *1.

[47]  *United States v. Singh*, 525 F. Supp. 3d 543, 546 (M.D. Pa. 2021).

### A.   Inability to Participate in RDAP and Other Rehabilitation Programs

Edmond first argues that compassionate release is warranted because he has been denied access to the RDAP program and its possible one-year sentence reduction, along with an additional six months at a halfway house.[48] This is an opportunity that would have been provided to Edmond but for the program in which he participates while incarcerated.[49]

This ground is not enumerated as a reason for granting compassionate release under the 2021 Sentencing Guidelines, unless it qualifies under the commentary's reference to "other reasons" that may support compassionate release.[50] It does not for two reasons.

First, although Edmond's actions while incarcerated are commendable, he has already received the benefit of his efforts through two sentence reductions—one applied to his mother's sentence, and one applied to his. Therefore, it cannot be said that Edmond has been punished for his activities. To the contrary, he has received a tangible and undeniable benefit in the form of a greatly reduced sentence for both him and his mother.

---

[48]   Doc. 109 at 11-14.
[49]   *Id.*
[50]   USSG § 1B1.13 cmt. n. 1(D).

Second, as the Government points out, a sentence reduction is not the primary goal of the RDAP program.[51] Rather, the program is designed to combat drug dependency and, as a corollary, assist in rehabilitation and aid a defendant's reintegration into society.[52] To that end, Edmond is eligible to receive these benefits through participation in the non-residential drug rehabilitation program.[53]

As noted previously, the Court recognizes that the 2023 version of the Sentencing Guidelines technically do not apply here since that version took effect on November 1, 2023, and Edmond filed his motion for compassionate release prior to that date, on August 14, 2023.[54] However, failing to account for the 2023 Sentencing Guidelines (or denying a motion that would be meritorious under those Sentencing Guidelines but not under earlier Sentencing Guidelines) would be a waste of judicial resources and would not be in the interests of justice. Such a denial would only delay consideration of Edmond's claims, as he could simply file a new motion for compassionate release immediately after the denial of this motion. Therefore, the Court will also consider whether Edmond's motion is meritorious under the 2023 Sentencing Guidelines.

Even under the 2023 Sentencing Guidelines, Edmond's inability to access RDAP does not constitute an extraordinary and compelling circumstance. The 2023

---

[51] Doc. 118 at 13.
[52] *Id.*
[53] Doc. 109 at 51.
[54] *See Kramer*, 2024 WL 313389 at *1 n.3.

version of the Sentencing Guidelines contains a catchall provision that permits a finding of extraordinary and compelling circumstances if a "defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in [proceeding] paragraphs . . . are similar in gravity to those described" in the prior paragraphs of § 1B1.13(b).[55] The denial of Edmond's ability to participate in the RDAP program does not qualify as an extraordinary and compelling circumstance under this provision for several reasons.

The Sentencing Guidelines make clear that "other circumstances" justifying compassionate release are cabined to those that are similar in nature to four defined categories of circumstances—those being the defendant's serious medical issues, advanced age, sexual abuse at the hands of his prison custodian(s), or the incapacitation of immediate family where the defendant would be the sole caregiver.[56]

Here, the denial of RDAP or other rehabilitative programs is not similar in nature to those circumstances. For one, all of those defined situations involve circumstances entirely outside of the defendant's control. After all, an individual

---

[55] *United States Sentencing Guidelines Manual* § 1B1.13(b)(5) (2023). Those circumstances include serious physical or medical conditions, the age of the defendant, the incapacitation of an immediate family member where the defendant would be the only available caregivers, and being the victim of abuse by an individual who had custody or control over the defendant. *Id.* § 1B1.13(b)(1)-(5).

[56] *Id.*

cannot very well control his age, his health,[57] whether he is victimized by a prison official who occupies a position of power over him, or the incapacitation of a family member. But a defendant does have some control over his successful participation in rehabilitation programs, since he not only must agree to participate in those programs, but must successfully complete the programs before he obtains any benefit—in the form of rehabilitative assistance, a sentence reduction, or otherwise—from them.[58]

Furthermore, there is no element of discretion in any of those enumerated circumstances, while an element of discretion is plainly present in determining whether an inmate may participate in the RDAP program. Individuals are not entitled to participate in the RDAP program and may be excluded categorically[59] or on a case-by-case basis,[60] and may be removed at the BOP's discretion due to "disruptive behavior related to the program or unsatisfactory progress in treatment."[61] And even beyond whether an inmate may participate in RDAP or other rehabilitative programs, "Congress has granted the BOP broad discretion in determining whether

---

[57] With the exception of preventative measures such as diet and health, which have no impact on circumstances such as cancer, heart failure, cognitive impairment, etc.

[58] *See* 28 C.F.R. §§ 550.53(b), (g).

[59] *See, e.g., United States v. Mason*, No. CR TDC-20-0217, 2023 WL 8005034, at *2 (D. Md. Nov. 17, 2023) (noting that defendant's 18 U.S.C. "§ 924(c) conviction undisputedly rendered him ineligible for the" RDAP program).

[60] *See United States v. Castro*, No. 5:06-CR-54, 2022 WL 4082475, at *4 (W.D. Va. Sept. 6, 2022) ("The BOP may exclude inmates from the RDAP program, either categorically or on a case-by-case basis, subject to its obligation to interpret the statute reasonably").

[61] 28 C.F.R. § 550.53(g)(1).

to reduce the sentence of a prisoner who has successfully completed an RDAP"[62] and, therefore, when a prisoner successfully completes the RDAP program, the BOP "has the authority, but not the duty, both to alter the prisoner's conditions of confinement and to reduce his term of imprisonment."[63]

Moreover, the enumerated circumstances all involve a significant element of risk to the health, safety, or life of individuals. Here, simply denying Edmond the ability to participate in RDAP, particularly in light of the fact that Edmond is still permitted to participate in the non-residential drug rehabilitation program,[64] does not rise to such a level. Accordingly, the denial of the ability to participate in RDAP does not constitute an "other circumstance" under § 1B1.13(b)(5) of the Sentencing Guidelines.

In sum, the Court concludes that Edmond's inability to participate in the RDAP program does not constitute an extraordinary and compelling circumstance sufficient to warrant compassionate release. In so holding, the Court joins the majority of courts in this country that have rejected such an argument.[65]

---

[62] *Richardson v. Joslin*, 501 F.3d 415, 420 (5th Cir. 2007).
[63] *Lopez v. Davis,* 531 U.S. 230, 241 (2001).
[64] Doc. 109 at 51.
[65] *E.g., United States v. Garcia*, No. CR 21-884 (KSH), 2023 WL 6874505, at *2-3 (D.N.J. Oct. 18, 2023); *United States v. Croft*, No. 6:10-CR-01090-DCC-1, 2023 WL 6457767, at *3-4 (D.S.C. Oct. 4, 2023); *United States v. Smith*, No. 218CR001406JRGCRW, 2023 WL 3589840, at *10 (E.D. Tenn. May 22, 2023), *aff'd*, No. 22-5559, 2023 WL 4703864 (6th Cir. July 24, 2023); *United States v. Sessum*, No. 15 CR. 667-6 (KPF), 2023 WL 3319424, at *4 (S.D.N.Y. May 9, 2023); *United States v. Segura-Sanchez*, No. CR 17-42, 2023 WL 2646434, at *3 (E.D. La. Mar. 27, 2023); *United States v. Woodson*, No. 20-CR-00218-SI-1, 2022 WL

### B.      Intervening, Nonretroactive Changes in the Law

The Court next turns to Edmond's contention that intervening changes in the law justify compassionate release.[66] Specifically, Edmond argues that upward adjustments to his offense level for possession of a firearm during the offense and for playing a leadership role in the conspiracy would no longer apply in light of *Apprendi* and *Alleyne*.[67] Edmond's assertion creates two unique questions that must be resolved. First, whether binding precedent from the United States Court of Appeals for the Third Circuit forecloses Edmond's claim and second, if not, whether Edmond's assertion has any merit.

### 1.      Whether Edmond's Claim is Foreclosed by Binding Precedent

The 2023 amendments to the Sentencing Guidelines provide that courts may consider nonretroactive changes to the law in limited circumstances.[68] Namely, if an individual "received an unusually long sentence and has served at least 10 years of the term of imprisonment" then courts may consider nonretroactive changes in the law in determining whether extraordinary and compelling circumstances exist, but "only where such change would produce a gross disparity between the sentence

---

4296070, at *4 (N.D. Cal. Sept. 15, 2022); *Castro*, 2022 WL 4082475 at *4-5; *United States v. Toney*, No. 18-CR-1405-BAS-2, 2022 WL 1174094, at *3 (S.D. Cal. Apr. 20, 2022).

[66]   *Id.* at 14-20.

[67]   Doc. 109 at 15-17.

[68]   *See* USSG § 1B1.13(b)(6).

being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances."[69]

This definition appears, at first blush, to be in conflict with the Third Circuit's decision in *United States v. Andrews*.[70] In *Andrews* the Third Circuit held that "the duration of [a lawfully imposed] sentence and the nonretroactive changes to mandatory minimums could not be extraordinary and compelling reasons warranting sentence reduction."[71] Decisions of the Third Circuit are, of course, binding on this Court.[72] Ordinarily, that would be the end of the story; neither *Apprendi* nor *Alleyne* are retroactively applicable,[73] and *Andrews* is binding precedent that holds nonretroactive changes in the law do not constitute extraordinary and compelling circumstances. In fact, the Third Circuit recently affirmed that *Andrews* remains binding precedent.[74]

Because neither the Third Circuit nor the Supreme Court of the United States has acted to overrule *Andrews*, some courts within this Circuit have concluded that *Andrews* remains binding and precludes courts from determining that retroactive changes in the law may constitute an extraordinary and compelling circumstance,

---

[69] *Id.*
[70] 12 F.4th 255 (3d Cir. 2021).
[71] *Id.* at 260.
[72] *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 202-03 (3d Cir. 2017) (explaining that decision of a court of appeals are binding on district courts within that circuit).
[73] *United States v. Reyes*, 755 F.3d 210, 212-13 (3d Cir. 2014).
[74] *United States v. Stewart*, 86 F.4th 532, 535 (3d Cir. 2023).

despite the recent addition of § 1B1.13(b)(6) to the Sentencing Guidelines.[75] But such a conclusion is contrary to the delegation of authority that Congress gave to the Sentencing Commission to define "extraordinary and compelling," and contrary to statements from the Third Circuit itself.

Years prior to *Andrews*, the Third Circuit analyzed the language of 18 U.S.C. § 3582(c)(1)(A)—specifically the requirement that compassionate release must be consistent with any policy statements issued by the Sentencing Commission—and determined that the Policy Statement contained at USSG § 1B1.13 is binding on federal courts.[76] It is true that *Andrews* concluded the opposite—that the Sentencing Guidelines § 1B1.13 is not binding.[77] However, *Andrews* reached that determination based on the unique circumstances presented there, where the Sentencing Commission had for years been unable to muster a quorum to amend the Sentencing Guidelines. As a result, the Sentencing Guidelines did not reflect Congress' 2018 amendment to 18 U.S.C. § 3582(c)(1)(A) that permitted—for the first time— prisoners to initiate motions for compassionate release, rather than just the Government.[78] This led to a natural conclusion: because "the text of the policy statement explicitly limits its application to Bureau-initiated motions . . . according

---

[75] *See, e.g., United States v. Carter*, __ F.Supp.3d __, __, No. CR 07-374-1, 2024 WL 136777, at *6 (E.D. Pa. Jan. 12, 2024) (holding that "[u]nless and until any reconsideration of *Andrews* takes place or it is abrogated by a Supreme Court decision, that holding remains binding on district courts in this circuit").

[76] *United States v. Berberena*, 694 F.3d 514, 521-22 (3d Cir. 2012).

[77] *Andrews*, 12 F.4th at 259.

[78] *Id.* at 257-58.

to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions."[79]

*Andrews* therefore eschewed the ordinary rule that the policy statement contained at USSG § 1B1.13 is binding, but only because the Sentencing Guidelines themselves provided that the policy statement did not apply to prisoner-initiated motions. The 2023 Sentencing Guidelines fixed this issue and now explicitly provides that the policy statement applies to a "motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A)."[80] When applying the 2023 Sentencing Guidelines, therefore, this Court must revert to the ordinary rule that § 1B1.13 is binding.

Moreover, while the Third Circuit in November of last year affirmed that *Andrews* remains binding, it further noted that the Sentencing Guidelines had been amended but, because the 2023 Sentencing Guidelines did not apply to that case, in the future it "may consider their effect on the validity of *Andrews* in an appropriate case."[81] The Third Circuit also emphasized that it was affirming *Andrews*' holding with a caveat: it stated only that "*[a]bsent changes in the applicable policy statements*, our holding in *Andrews* remains undisturbed."[82]

---

[79]   *Id.* at 259 (footnote omitted).
[80]   USSG § 1B1.13(a).
[81]   *Stewart*, 86 F.4th at 535 n.2.
[82]   *Id.* at 535 (emphasis added).

The 2023 Sentencing Guidelines did just that: it changed the applicable policy statement contained at § 1B1.13 to define extraordinary and compelling circumstances as including nonretroactive changes to the law, at least in certain circumstances.[83] That binding policy statement effectively abrogates *Andrews*. Because the 2023 Sentencing Guidelines control, Edmond may qualify for compassionate release based on nonretroactive changes to the law, assuming he otherwise satisfies the requirements of USSG § 1B1.13(b)(6).

### 2. Whether a Nonretroactive Change in the Law as Applied to Edmond Constitutes an Extraordinary and Compelling Circumstance

The Court turns now to the question of whether Edmond has satisfied the requirements of USSG § 1B1.13(b)(6). As discussed below, the nonretroactive changes to which Edmond cites are insufficient to constitute an extraordinary and compelling circumstance because they do not apply to Edmond.

Edmond argues that two nonretroactive decisions from the Supreme Court— *Apprendi* and *Alleyne*— fundamentally altered the law, meaning certain sentencing enhancements that were applied to him in 1997 should no longer apply.[84] The Government responds that, not only is this argument barred by *Andrews*,[85] but *Apprendi* and *Alleyne* only found that facts that increase the maximum penalty for a

---

[83]  USSG § 1B1.13(b)(6).
[84]  Doc. 109 at 15-17.
[85]  As discussed above, the Court concludes that *Andrews* has been abrogated by the 2023 Sentencing Guidelines.

crime must be submitted to a jury and, here, no fact increased the maximum penalty for Edmond's conviction.[86]

The Government's reading of the Supreme Court decisions at issue is incorrect. It is true that, in *Apprendi*, the Supreme Court determined, in accordance with the Fourteenth Amendment to the United States Constitution, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[87] But the Supreme Court later extended that rule in *Alleyne* by holding that the Constitution requires that any fact that increases the minimum sentence to which the defendant is subjected must also be submitted to a jury or admitted by the defendant.[88] In doing so, the Supreme Court explicitly overruled its prior precedent that "held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment."[89] Accordingly, a fact that increases the minimum sentence likewise must be submitted to a jury or agreed upon by the parties in a plea agreement.[90]

---

[86] Doc. 118 at 15-17.

[87] *Apprendi*, 530 U.S. at 490.

[88] *Alleyne*, 570 U.S. at 103.

[89] *Id.*

[90] *See, e.g., Shea v. United States*, 976 F.3d 63, 76 (1st Cir. 2020) ("In *Alleyne*, the Court made clear that under the Sixth Amendment analysis that doomed the mandatory Guidelines, a fact that raises either (maximum *or* minimum) end of the 'legally prescribed range of sentences to which a criminal defendant is exposed' necessarily changes 'the penalty *affixed* to the [defendant's] crime'" (quoting *Alleyne*, 570 U.S. at 112)).

For cases of recent vintage, the application of *Apprendi* to any Sentencing Guidelines issue is fairly straightforward. That is because, in deciding *Apprendi*, the Supreme Court was careful to emphasize that its ruling did "not mean that any fact that influences judicial discretion must be found by a jury" and distinguished between facts "[e]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law;"[91] since the Sentencing Guidelines are advisory, any alterations to that range merely guide the sentence that may be imposed. Following the decision in *Alleyne*, the Third Circuit confirmed "that factual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in *Alleyne*."[92]

But that task is more complicated when applying *Alleyne* to pre-2005 sentences. That is because, prior to the Supreme Court's 2005 decision in *United States v. Booker*, the Sentencing Guidelines were "mandatory and binding on all judges."[93] Because the mandatory nature of the Sentencing Guidelines was incompatible with the Constitution, the Supreme Court in *Booker* excised portions of the federal sentencing statute to "make[] the Guidelines effectively advisory" and

---

[91] *Alleyne*, 570 U.S. at 116-17.
[92] *United States v. Freeman*, 763 F.3d 322, 335 (3d Cir. 2014) (internal quotation marks omitted).
[93] *United States v. Booker*, 543 U.S. 220, 233 (2005).

to merely require courts to consider the Sentencing Guidelines, while also permitting "the court to tailor the sentence in light of other statutory concerns as well."[94]

As the Supreme Court in *Booker* observed, any judicial factual finding that increased the Sentencing Guidelines range under the previous mandatory Sentencing Guidelines effectively increased the minimum range of the sentence.[95] Since "the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges," it followed that any judicial finding of fact that increases the Sentencing Guidelines range necessarily "increased the sentence that the defendant could have otherwise received" and violated the Constitution.[96]

This, of course, renders inapplicable the Third Circuit instruction that *Alleyne* does not apply to the calculation of "an advisory Guidelines sentence."[97] This Court must therefore determine whether *Apprendi* and *Alleyne* apply to sentences that were calculated and imposed pre-*Booker*. While the Third Circuit does not appear to have addressed this issue, other courts have persuasively determined—in other contexts—that *Alleyne* applies to pre-*Booker* sentencing determinations.

First, the United States Court of Appeals for the First Circuit in *Shea v. United States* examined whether USSG § 4B1.2(a)(2)'s "residual clause" was

---

[94]   *Id.* at 245.
[95]   *Id.* at 232-33.
[96]   *Id.*
[97]   *Freeman*, 763 F.3d at 335.

unconstitutionally vague as applied to pre-*Booker* sentencing determinations.[98] That court examined the relevant caselaw from the Supreme Court and observed that in *Alleyne*, the Supreme Court "made clear that under the Sixth Amendment analysis that doomed the mandatory Guidelines, a fact that raises either (maximum *or* minimum) end of the 'the legally prescribed range of sentences to which a criminal defendant is exposed' necessarily changes 'the penalty *affixed* to the defendant's crime.'"[99]

Accordingly, "when a fact bumps up 'the legally prescribed punishment' (meaning it 'affixes' a new penalty to the defendant's conduct) it necessarily 'constitutes an element of a separate, aggravated offense that must be found by the jury.'"[100] This meant that "the mandatory Guidelines violated the Sixth Amendment (at least when no departure was available) because they changed the range of penalties 'affixed' to the defendant's conduct, even if some other statute listed a higher so-called 'maximum' sentence for the crime of conviction."[101]

The First Circuit therefore concluded that "precedent leaves no room for debate: when the pre-*Booker* Guidelines bound the judge to impose a sentence within a prescribed range, as they ordinarily did, they necessarily fixed the permissible range of sentences (s)he could impose, whether they fixed a higher maximum *or*

---

[98]   976 F.3d 63, 65-66 (1st Cir. 2020)
[99]   *Id.* at 76 (quoting *Alleyne*, 570 U.S. at 112 (brackets omitted)).
[100]  *Id.* at 77 (quoting *Alleyne*, 570 U.S. at 114-15).
[101]  *Id.*

minimum sentence."[102] Stated differently, because "the pre-*Booker* Guidelines themselves routinely 'established the permissible bounds of the court's sentencing discretion," even when an enhancement under the Sentencing Guidelines "only 'elevated the low-end of the sentencing range' . . . the guideline [still] increased 'the defendant's 'expected punishment . . . as a result of the narrowed range'" because "the judge could *not* have imposed the same range of penalties as without the enhancement."[103] As such, *Alleyne* unquestionable governs pre-*Booker* sentencing determination under the then-mandatory Sentencing Guidelines.[104]

And in an opinion respecting the United States Court of Appeals for the Eleventh Circuit's denial of rehearing *en banc* in *Lester v. United States*, Judges Rosenbaum, Martin, and Jill Pryor reached a conclusion similar to that of the First Circuit.[105] As did the First Circuit, those judges recognized that "when 'Congress required sentencing courts to apply the Sentencing Guidelines and impose a sentence within the applicable guidelines range, it was reasonable to view the Guidelines as effectively setting minimum and maximum penalties that varied based on the circumstances of the offense and the characteristics of the offender.'"[106] Therefore, any defendant who had an enhancement under the Sentencing Guidelines wrongfully

---

[102] *Id.* (brackets, internal citations, and internal quotation marks omitted).
[103] *Id.* at 78-79 (quoting *Beckles v. United States*, 580 U.S. 256, 266 (2017); *Alleyne*, 570 U.S. at 113 (brackets omitted)).
[104] *Id.*
[105] 921 F.3d 1306 (11th Cir. 2019).
[106] *Id.* at 1329 (quoting *United States v. Wright*, 607 F.3d 708, 717-18 (11th Cir. 2010))

applied "was subjected to a higher mandatory-minimum sentence than he would have been under the mandatory Guidelines regime, had the . . . guideline [enhancement] not been applied. And that is a constitutional problem" under *Alleyne*.[107]

The Judges succinctly summarized the constitutional problem with applying judicial factfinding to the pre-*Booker* Sentencing Guidelines: by applying the "guideline[s] in a mandatory way," application of any enhancement under the Sentencing Guidelines elevated "'the low-end of a sentencing range[, which] heightens the loss of liberty associated with the crime: the defendant's expected punishment has increased as a result of the narrowed range.'"[108] Any conclusion to the contrary would "ignore[] the fact that when a court applied the [Sentencing Guidelines] during the mandatory Guidelines regime, the legally prescribed range of available sentences differed from what it would have been in the absence of the . . . guideline [enhancement] during the mandatory Guidelines regime."[109]

The Court finds this reasoning persuasive, and concludes that *Alleyne*, as applied to pre-*Booker* sentencing determinations, prohibits the increase of a Sentencing Guidelines range based on judicial factfinding by a preponderance of the evidence; rather, any such facts must be determined by a jury or admitted by the

---

[107] *Id.*
[108] *Id.* (quoting *Alleyne*, 570 U.S. at 113).
[109] *Id.* at 1330 (internal quotation marks omitted).

defendant. However, simply because *Alleyne* applies to pre-*Booker* sentencing determinations does not mean that it applies to Edmond, since an *Alleyne* violation would only have occurred here if Edmond's Sentencing Guidelines range were increased based on facts not "found by a jury or admitted by a criminal defendant."[110]

The two enhancements that Edmond references as violative of *Alleyne* were a leadership enhancement and a firearm enhancement.[111] As to the firearm enhancement, the PSR made clear that a firearm enhancement was warranted "because firearms were possessed by the defendant's co-conspirators" and such "conduct was reasonably foreseeable to Mr. Edmond and thus is relevant for guideline calculation purposes."[112] The facts supporting that statement came from the Government, which asserted that it was reasonably foreseeable to Edmond that his coconspirators would use, and had used, "firearms to further the objects of the conspiracy, and to protect themselves, their illegal profits, and their contraband drugs."[113] Moreover, Edmond knew that his coconspirators had used violence and firearms in past criminal conduct and Edmond had engaged in numerous conversations with a coconspirator in which that coconspirator threatened to kill other individuals for nonpayment of drug debts.[114]

---

[110] *Robinson v. Woods*, 901 F.3d 710, 712 (6th Cir. 2018).
[111] Doc. 109 at 15-16.
[112] PSR at 11.
[113] *Id.* at 9.
[114] *Id.*

Critically, Edmond lodged no objections to the PSR.[115] To the contrary, at sentencing Edmond and his attorney agreed that the PSR "was a full and fair report."[116] It is well established that federal courts "'may accept any undisputed portion of the presentence report as a finding of fact.'"[117] This was well established long before Edmond's sentencing hearing, with earlier decisions repeatedly expressing that "a sentencing court may rely on the facts set forth in the presentence report when their accuracy is not challenged by the defendant."[118] By failing to object to the crucial facts that supported the firearm enhancement, Edmond admitted to those facts, which is sufficient to avoid any constitutional issue under *Alleyne*.[119]

The second enhancement applied by the PSR was for Edmond's role as a leader in the conspiracy.[120] Again, the PSR set forth the facts necessary to reach the conclusion that Edmond was the leader in a conspiracy of five or more people. It detailed that Edmond "facilitated multi-kilogram cocaine transactions between dealers who needed cocaine to sell, and cocaine suppliers who needed a customer base."[121] The PSR noted that, although Edmond acted as a broker, he "remained at the hub of a conspiracy, the spoke of which reached from the inner city of the District

---

[115] PSR at 16.

[116] Doc. 41-2 at 32.

[117] *United States v. De Castro*, 49 F.4th 836, 848 (3d Cir. 2022) (quoting Fed. R. Crim. P. 32(i)(3)(A)).

[118] *United States v. Watkins*, 54 F.3d 163, 166-67 (3d Cir. 1995).

[119] *Robinson*, 901 F.3d at 712.

[120] PSR at 11.

[121] *Id.* at 5.

of Columbia, to cocaine cartels located in Medellin, Colombia, South America."[122]
In short, without Edmond, the conspiracy would not have existed. Moreover, it was
Edmond who communicated with coconspirators in order "to plan, organize and
facilitate drug transactions, to mediate disputes, and to influence the supply and price
of cocaine furnished."[123]

These facts ultimately led to a four-level increase in Edmond's offense level
for being a leader or organizer of the conspiracy. Again, Edmond lodged no
objections to those facts,[124] meaning he admitted to their accuracy.[125] Because
Edmond admitted to the facts that supported his enhancement for being a leader or
organizer of the conspiracy, the application of that enhancement provoked no
constitutional issue under *Alleyne*.[126]

In sum, although *Apprendi* and *Alleyne* apply to Sentencing Guidelines
adjustments in pre-*Booker* sentences, and although such adjustments were applied
in Edmond's case, he admitted to the necessary facts to support those enhancements.
Therefore, the rule set forth in *Alleyne* was not violated here, and Edmond has failed
to demonstrate that any nonretroactive change in the law is applicable to his case

---

[122] *Id.*
[123] *Id. See id.* at 6-9 (providing details of conspiracy).
[124] *Id.* at 16; Doc. 41-2 at 32.
[125] *De Castro*, 49 F.4th at 848.
[126] *Robinson*, 901 F.3d at 712.

such that USSG § 1B1.13(b)(6) could provide the requisite extraordinary and compelling circumstances.

### C.    Other Considerations

Finally, Edmond details a series of other issues that he believes constitute extraordinary and compelling circumstances, none of which warrant as much discussion as the first two. Edmond argues that his relatively advanced age,[127] his "impressive rehabilitation" efforts and work for the community,[128] his strong support system,[129] his failure to receive Good Time Credits,[130] his mother's rapidly declining health,[131] and other miscellaneous factors[132] all warrant compassionate release.

First, as to the declining health of Edmond's mother, the Sentencing Guidelines provide that the health of an individual's parent may constitute an extraordinary and compelling circumstance, but only if the parent is incapacitated and "the defendant would be the only available caregiver for the parent."[133] Although Edmond's mother appears to be suffering from significant health issues, including kidney failure and congestive heart failure,[134] there is no indication that these conditions have incapacitated her. Moreover, Edmond has not demonstrated that he

---

[127]  Doc. 109 at 21-22.
[128]  *Id.* at 22-26.
[129]  *Id.* at 26-35.
[130]  *Id.* at 36-38.
[131]  *Id.* at 40-41.
[132]  *Id.* at 38-42.
[133]  USSG § 1B1.13(b)(3).
[134]  Doc. 109 at 40.

is her sole caretaker.[135] This therefore cannot constitute an extraordinary and compelling circumstance that warrants compassionate release.

Second, while Edmond references his age,[136] the Sentencing Guidelines provide that age may constitute an extraordinary and compelling circumstance, but only if the defendant is at least 65 years of age, "is experiencing a serious deterioration in physical or mental health because of the aging process," and has served the lesser of 10 years or 75 percent of his term.[137] Edmond's circumstances cannot qualify as extraordinary or compelling under this provision because he is not yet 65 years of age.[138]

Next, Edmond asserts that the Bureau of Prison's failure to correctly award him Good Time Credits is sufficient to warrant compassionate release.[139] Even if the BOP has miscalculated Edmond's Good Time Credits, the Third Circuit has repeatedly held that any claim brought by a prisoner that "challenges the BOP's calculation of sentence credits . . . is appropriately addressed in a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241."[140] Accordingly, this claim is not

---

[135] To the contrary, in his reply brief, Edmond asserts that his mother "must rely on the assistance of a caregiver." Doc. 127 at 13. This demonstrates that Edmond's mother in fact has a caretaker other than Edmond.

[136] *Id.* at 21-22.

[137] USSG 1B1.13(b)(2).

[138] *See* PSR at 2.

[139] Doc. 109 at 36-38.

[140] *United States v. Vidal*, 647 F. App'x 59, 60 (3d Cir. 2016) (citing *United States v. Grimes*, 641 F.2d 96, 99 (3d Cir. 1981)). *See also United States v. Murphy*, 684 F. App'x 113, 115 (3d Cir. 2017) (noting that "that the appropriate vehicle for challenging the BOP's determination

properly brought in a motion for compassionate release, and cannot constitute an extraordinary and compelling circumstance that warrants compassionate release.[141]

Fourth, Edmond asserts this Court miscalculated the time left on his sentence in ruling on a prior motion for a sentence reduction,[142] and if "the Court's intention was to leave him with a thirty-month sentence, but instead left him with thirty-eight months," then Edmond should be credited with eight months to his sentence.[143] But Edmond is incorrect. The Court plainly stated that Edmond should receive only "the 36-month sentence reduction proposed by the Government," and the Order properly implemented its intention to grant a 36-month reduction.[144]

Although the Court did state that it believed Edmond would be left with approximately 30 months to serve of his sentence, that statement was merely in service of describing the benefit that Edmond was to receive. It was not intended to explain the Court's decision with respect to the amount of time that should have

---

[regarding sentencing credits] would be a petition filed pursuant to 28 U.S.C. § 2241" (citing *Blood v. Bledsoe*, 648 F.3d 203, 205-06 (3d Cir. 2011)).

[141] *See, e.g., United States v. Croft*, No. 6:10-CR-01090-DCC-1, 2023 WL 6457767, at *3 (D.S.C. Oct. 4, 2023) (denying compassionate release and holding "that a habeas petition under § 2241, not compassionate release, is the proper way to challenge the computation of a sentence, i.e., a reduction in sentence based on Time Credits"); *United States v. Sistrunk*, No. 4:13-CR-18-CDL-MSH, 2022 WL 1310797, at *2 (M.D. Ga. Mar. 21, 2022) (denying motion for compassionate release because, *inter alia*, any challenge to "the BOP's calculation of good time credits . . . must be brought as a habeas petition under 28 U.S.C. § 2241 in the district court for the district in which the inmate is incarcerated"), *report and recommendation adopted*, No. 4:13-CR-18-CDL-MSH, 2022 WL 1308822 (M.D. Ga. May 2, 2022).

[142] Doc. 109 at 38-39.

[143] Doc. 127 at 6.

[144] Doc. 78 at 7. *See* Doc. 79.

remained on Edmond's sentence. Therefore, this too cannot support a motion for compassionate release.

Fifth, Edmond discusses his rehabilitative efforts and work with the community in the District of Columbia.[145] However, federal law explicitly provides that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason,"[146] which is echoed by the Sentencing Guidelines provision that states "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement" although it may be considered in deciding whether and to what extent a sentence reduction may be warranted if the threshold extraordinary and compelling reason is produced.[147] This is in accord with previous rulings from the Third Circuit.[148] Consequently, Edmond's rehabilitative efforts do not qualify as an extraordinary and compelling circumstance that would warrant compassionate release.

Finally, the remaining reasons provided by Edmond in support of compassionate release, such as his strong support system and efforts to assist his

---

[145]   Doc. 109 at 22-26.

[146]   28 U.S.C. § 994(t).

[147]   USSG § 1B1.13(d).

[148]   *See United States v. Bledsoe*, No. 22-2022, 2022 WL 3536493, at *2 (3d Cir. Aug. 18, 2022) (holding that "claimed efforts in furtherance of rehabilitation, while commendable, are 'expected'; they are, standing alone, neither 'extraordinary' nor 'compelling' for purposes of the compassionate-release standard" (internal citation omitted)); *United States v. Andrews*, 12 F.4th 255, 262 (3d Cir. 2021) (finding no clear error in determination that defendant's rehabilitation was not a compelling reason warranting compassionate release).

community in the District of Columbia,[149] are all relevant to the 18 U.S.C. § 3553(a) factors and whether and to what extent a sentence reduction may be warranted.[150] However, these considerations are not germane to "the threshold question of whether any given prisoner has established an 'extraordinary and compelling' reason for release under § 3582(c)(1)(A)(i)."[151]

In sum, Edmond has failed to satisfy his threshold burden of demonstrating that any extraordinary and compelling circumstances would warrant the grant of compassionate release. Accordingly, this Court cannot reach the question of whether release is appropriate under the relevant § 3553(a) factors, and Edmond's motion for compassionate release must be denied.

## III.   CONCLUSION

For the foregoing reasons, Edmond's motion for compassionate release will be denied.

An appropriate Order follows.

                              BY THE COURT:


                              *s/ Matthew W. Brann*
                              Matthew W. Brann
                              Chief United States District Judge

---

[149] Doc. 109 at 22-35.
[150] *See* 18 U.S.C. § 3582(c)(1)(A)(i).
[151] *Stewart*, 86 F.4th at 535 (internal quotation marks omitted).